IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| IRENE SHIPE | : | |
|---|---|---|
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-00719 |
| HAVERFORD TOWNSHIP | : | |

| ROBERT LAWSON | : | |
|---|---|---|
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-00720 |
| HAVERFORD TOWNSHIP | : | |

**SURRICK, J.**                                                     **FEBRUARY 16, 2010**

## MEMORANDUM

Irene Shipe and Robert Lawson (collectively, "Plaintiffs") filed this action against Haverford Township ("Defendant") alleging age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq*. Presently before the Court is the Township of Haverford's Motion for Summary Judgment. (Doc. No. 11.)[1] For the following reasons, the Motion will be granted.

## I. BACKGROUND

### A. Irene Shipe

Irene Shipe was born on September 28, 1941. (Shipe Dep. 9:13-15.) In or around 1990,

---

[1] *Shipe v. Haverford Township*, No. 09-0719, and *Lawson v. Haverford Township*, No. 09-0720, were consolidated for the purposes of discovery. (Doc. No. 8 ¶ 1.) All docket citations are to the docket in *Shipe*, No. 09-0719, unless otherwise noted.

Shipe began working for Defendant as a switchboard operator. (*Id.* at 29:16-19.) After briefly assuming responsibilities as the secretary to the township administrative secretary, Shipe obtained a position as the secretary to the safety director. (*Id.* at 29:20-30:7.) In 1996, Shipe took over as safety director for Haverford Township. (Doc. No. 11, Ex. Q at 11.)

Shipe's responsibilities as safety director included hiring and supervising crossing guards and meter officers, researching and writing ordinances for the signage in the township, approving handicapped spaces at homes, generating accident and injury reports for the police department and township employees, approving block party permits, and holding semiannual auctions of recovered but unclaimed stolen bikes. (Shipe Dep. 12:20-13:5.) Shipe also acted as a liaison to PENNDOT for road surveys, met with civic councils and parent-teacher organizations, and organized safety assemblies at Haverford schools. (*Id.* at 13:15-14:9.) Shipe's salary as of her date of termination was approximately $52,000 per year. (*Id.* at 15:7-10.) Defendant paid 75% of Shipe's salary, with the remaining 25% paid by the school district. (*Id.* at 15:11-21.)

Shipe testified that she had heard several comments about her age from township employees. A meter officer named Frank McGrath told her that a commissioner had asked him when Shipe planned to retire. (*Id.* at 32:12-33:7.) Other unidentified persons asked whether Shipe was collecting social security or a pension. (*Id.* at 32:1-4.) After Shipe was involved in a car accident, another unidentified person suggested that Shipe should take a driving test due to her age. (*Id.* at 32:5-11.)

Defendant terminated Shipe's employment on December 31, 2007. (*Id.* at 12:8-11.)

**B.     Robert Lawson**

Robert Lawson was born on October 4, 1942. (Doc. No. 11, Ex. Q at 7.) Defendant hired

him as a laborer in its highway department in 1966. (Lawson Dep. 15:17-16:5.) Lawson was eventually promoted to assistant highway inspector. (*Id.* at 12:19-22.) He was promoted to highway inspector on November 10, 2005, upon the death of the previous highway inspector. (*Id.* at 13:8-14; Doc. No. 11, Ex. Q at 7.)

Lawson's duties as highway inspector included inspecting roads, sidewalks, and curbs for potholes and deterioration, monitoring occupancy on roads, ensuring that contractors had the appropriate licenses and permits, interfacing with the U.S. Department of Housing and Urban Development regarding highway repaving, compiling lists of roads to be repaved, pricing road repairs with contractors, and submitting plans for road repairs to the township commissioners for approval. (Lawson Dep. 16:6-23.) He also supervised contractors, PECO employees, sewer contractors, and any others who were paving roads or sidewalks. (*Id.* at 21:3-19.) Lawson's salary was approximately $40,000 per year. (Doc. No. 11 Ex. Q at 7.)

In November 2007, Lawson began to hear rumors from several sources that his position would be terminated in the 2008 budget. (Lawson Dep. 33:12-19.) Defendant terminated Lawson's employment on December 31, 2007. (*Id.* at 12:7-10.) Approximately four weeks after terminating Lawson's employment, Defendant offered Lawson a position as a night watchman. (*Id.* at 69:18-71:3.) Lawson turned down the position because it required heavy lifting, which he was incapable of doing, and required him to obtain a commercial driver's license, which he believed he would be unable to obtain due to his diabetes. (*Id.* 71:4-72:15.) Lawson is currently unemployed. (*Id.* 11:10-15.)

### C. Circumstances Surrounding Plaintiffs' Termination

In 2005, Defendant commissioned an operational efficiency audit by Econsult

Corporation, an independent consultant. Econsult's audit report recommended the creation of a new director of public safety position that would oversee the police department, fire department, and paramedics. The director of public safety would also act as assistant township manager, and the police chief, fire marshal, and paramedic director would report to the new director. (Doc. No. 11, Ex. F at 8-9.) The report also recommended that the existing director of public safety position, which was occupied by Shipe, be eliminated because "that function [could] be handled by administrative staff." (*Id.* at 9.) The report made no mention of the highway inspector position occupied by Lawson. Defendant did not create the new director of public safety position recommended by Econsult, and it did not immediately terminate Shipe's position. Shipe testified that the report "disappeared from radar" soon after it was produced and that the township's employees never heard about it again. (Shipe Dep. 56:10-16.)

Larry Gentile was appointed acting township manager in April 2007 and was made township manager several months later. (Gentile Dep. 5:14-22.) As township manager, one of Gentile's responsibilities was to prepare Defendant's annual budget. (*Id.* at 14:22-15:1.) Gentile began working on the township's 2008 budget in August 2007. He prepared the budget with input from the township's department directors and finance director. (*Id.* at 15:7-12.) As part of the 2008 budget, Gentile proposed eliminating three positions: safety director, highway inspector, and recycling coordinator.[2] (*Id.* at 52:24-55:7; Doc. No. 11, Ex. N at 2.) Gentile

---

[2] Plaintiffs argue that the recycling coordinator, Charlie Falance, who was 54 when the 2008 budget was adopted, did not have his position eliminated as part of the 2008 budget but had instead been demoted to a position at the township's ice-skating rink earlier in 2007. Plaintiffs contend instead that James Gilhol, who was 78 when the 2008 budget was passed, had his position eliminated in December 2007 along with Plaintiffs'. (Doc. No. 13 at 7.) Defendant maintains that Gilhol voluntarily retired due to health issues and that Falance's position was one of the three that was eliminated as part of the 2008 budget along with Plaintiffs' positions. (Doc.

4

testified that he proposed eliminating the safety director and highway inspector positions because he believed that their duties could be performed by other members of the staff. (Gentile Dep. 53:3-12; 54:12-16.) Gentile also proposed reducing the fire marshal position to part-time, networking the township's computer systems, and hiring an in-house information technology employee rather than using outside contractors. (*Id.* at 55:4-5; Doc. No. 11, Ex. N at 2.) These proposals were designed to help reduce expenses and contain costs. (Doc. No. 11, Ex. N at 2.)

The fire marshal, James Marino, was 67 years old when Gentile proposed to reduce the fire marshal position to part-time. (Marino Dep. 8:22-23.) Gentile's proposal reduced the hours Marino spent performing fire marshal duties from 35 to 20 per week. However, Marino was offered additional responsibilities as a code enforcement officer for 20 hours per week, which he accepted. (*Id.* at 24:6-21.) These changes resulted in Marino's salary being reduced by approximately $21,000 per year. (*Id.* at 25:3-8.)

---

No. 11 at 8-9.)

    To support this contention, Defendant attaches an independent medical examination it commissioned to determine Gilhol's ability to perform his job functions. (*See* Doc. No. 11, Ex. G.) The doctor's report indicates that Gilhol "was clearly unstable walking," due at least in part to peripheral neuropathy that caused him to have virtually no feeling in his feet. (*Id.* at 2.) Gilhol also exhibited significant delay in his ability to recall information, including who was President of the United States. (*Id.*) The doctor concluded that Gilhol was "suffering from some significant cognitive impairment in focus, concentration, and memory, as well as significant peripheral neuropathy." (*Id.*) As a result, the doctor advised that "Mr. Gilhool [sic] is not able to perform his current job. There is no accommodation that I can recommend that would allow him to be able to drive or to interact with the public in a manner that would be consistent with providing confidence and competence." (*Id.* at 3.)

    We must view all facts and inferences in the light most favorable to Plaintiff. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). Although it is clear that Gilhol's health problems prevented him from performing his duties, we will assume for purposes of this Motion that Falance's demotion occurred earlier in 2007 and that Gilhol's position was terminated in the 2008 budget.

5

Gentile presented the 2008 budget to the Haverford Board of Commissioners at a meeting on December 10, 2007.[3] (Marino Dep. 21:24-22:13.) Gentile's budget message to the Board of Commissioners highlighted the need to make cuts in the budget. Even after trimming over two million dollars from the budget, Gentile calculated that mandatory wage and benefit increases, combined with higher sewer expenses and higher oil and utility costs, would require a tax increase of 0.804 mills. (Doc. No. 11, Ex. N at 1-2.) Gentile stated that the township would need to "eliminate additional expenses through ongoing cost containment, budgetary saving practices, and by adopting new purchasing policies and procedures." (*Id.* at 2.) The proposed elimination of the safety director, highway inspector, and recycling coordinator positions, as well

---

[3] It is unclear what was discussed at this meeting. Defense counsel asserted a privilege and instructed witnesses not to answer when they were asked about the meeting during depositions. (*See, e.g.*, Gentile Dep. 47:22-49:8.) There is nothing to suggest that an attorney was present at the meeting, and defense counsel has not stated what privilege he believes applies. Rather than contacting Chambers for a ruling or filing a motion to compel, Plaintiffs' counsel addresses Defendant's refusal to discuss aspects of the meeting in his Memorandum in Opposition to Defendant's Motion for Summary Judgment, in which he calls the meeting a "'private session' the contents of which the township refuses to disclose." (Doc. No. 13 at 2-3.) This prompted a reply brief from Defendant in which defense counsel again fails to specify which privilege he believes applies to the meeting. Instead, defense counsel notes only that he "refused to disclose executive session information as it pertained to other employees who are not a party to this lawsuit." (Doc. No. 14 at 2.) Plaintiffs' counsel then filed a surreply brief in which he asserts without citation that "because of defendant's refusal to disclose the substance of those discussions during its deposition, plaintiffs are entitled to an adverse inference that age was discussed." (Doc. No. 16 at 3.)

Summary judgment is not the appropriate procedural mechanism for resolving discovery disputes. *See Reyes v. Hannah*, No. 97-3922, 2000 WL 193503, at *1 (E.D. Pa. Feb. 17, 2000). Moreover, it is the policy of this Court that parties should file reply or surreply briefs only when absolutely necessary, and only when the parties wish to draw the Court's attention to controlling authority not previously cited by the parties. *See* Chambers Policies and Procedures, Surrick, J., at 2, *available at* http://www.paed.uscourts.gov/documents/procedures/surpol.pdf. Both parties have failed to observe these policies and procedures. Since we find the reply and surreply briefs to be unhelpful, we will not consider them in disposing of this summary judgment motion.

as changing the fire marshal position from full-time to part-time, was projected to save the township $175,000. (Doc. No. 11, Ex. N at 2.)

The Board of Commissioners adopted Gentile's 2008 budget in its entirety. The final vote of the Board of Commissioners was six to three, with Commissioners McGarrity, Moran, and McDonald voting against the budget and resulting layoffs. (McGarrity Dep. 43:24-44:7.) Five commissioners who voted in favor of the budget have submitted affidavits stating that age played no role in their decision, that they believed Shipe's and Lawson's duties could be handled by existing employees, and that elimination of these positions was a cost-saving measure. (*See* Doc. No. 11, Ex. I.) Commissioner Mario Oliva singled out Lawson, stating that he "did not feel that Robert Lawson was a productive employee and saw no reason to continue the position of Highway Inspector when the duties of that job could be assumed by other existing employees." (Oliva Aff. ¶ 5, Doc. No. 11, Ex. I.)

Commissioner McGarrity voted against the layoffs because he believed that Defendant did not need to lay people off. (*Id.* at 46:12-17.) Commissioner McGarrity also believed that age was a factor in the township's decision to terminate Shipe and Lawson. (*Id.* at 20:14-22:3.) Commissioner McGarrity testified that "it just seemed like, you know, they picked a lot of people who were older. And yet there's others there that if it was a budgetary matter they certainly could have gone to the bottom of the list and picked people there." (*Id.* at 21:22-22:2.) Commissioner McGarrity stated that the only reason why he believed that age was a factor was the number of older employees who were laid off in the 2008 budget. (*Id.* at 32:20-33:6 ("I felt that something had to be behind it if you're performing your duties as you're supposed to.

7

There's got to be something else behind it.").) Neither Gentile nor any of the commissioners said anything about Plaintiffs' age at the meeting. (*Id.* at 42:7-44:14.)

Commissioner Moran, who also voted against the budget, testified that he "didn't understand why [the township was] getting rid of the older employees [and] keeping the younger ones." (Moran Dep. 17:13-18.) But like Commissioner McGarrity, he did not recall any mention of Plaintiffs' age at the meeting. (*Id.* at 15:24-16:6.) Commissioner Moran also commented that he believed the Board of Commissioners "forced out" the township's police chief, Gary Hoover, who was 61 when the 2008 budget was adopted. But Commissioner Moran did not believe that Hoover's putatively forced retirement was due to age discrimination, observing that if "[y]ou don't have five commissioners happy, you're gone. . . . There's no mystery in life." (*Id.* at 28:20-29:24.)

Commissioner McDonald voted against the budget because she "did not believe it was a good idea." (McDonald Dep. 16:9-18.) She believed that someone Shipe's age would have difficulty getting another job and found that "upsetting." (*Id.* at 24:3-10.) She also believed that it did not make good budgetary sense to eliminate Shipe, because her duties would have to be performed by police officers who made more money than Shipe did. (*Id.* at 32:1-12.) Commissioner McDonald did not recall if age was discussed in relation to Plaintiffs' termination. (*Id.* at 16:20-18:4.)

After Plaintiffs' positions were terminated, their duties fell to other township employees. Lawson's responsibilities were handled by Steve Sinibaldi, who was the highway superintendent, and Michael Giordano, who was the director of public works. (Giordano Dep. 25:3-19.) Sinibaldi was 51 at the time of Lawson's termination, and Giordano was 57. (Doc. No. 11, Ex. Q

at 5, 11.) Other employees who took on some of Lawson's duties included Robert Macy and Greg Basile, who were 59 and 41 respectively when the 2008 budget was adopted. (Lawson Dep. 47:8-23; Doc. No. 11, Ex. Q at 1, 8.) After the elimination of the safety director position, Shipe's responsibilities were handled by members of the police department. (Gentile Dep. 53:3-12.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary

9

judgment, we must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer*, 54 F.3d at 1127. We must not resolve factual disputes or make credibility determinations. *Siegel Transfer*, 54 F.3d at 1127.

## III. DISCUSSION

The ADEA states that "[i]t shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Defendant argues that Plaintiffs have not offered sufficient evidence to support their claims under the ADEA or the PHRA.[4] (Doc. No. 11 at 12-14.) Plaintiffs contend that there is sufficient evidence in the record to raise a triable issue of fact. (Doc. No. 13 at 11-14.)

Defendant argues that the Supreme Court's recent decision in *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009), requires Plaintiffs to prove that age was the but-for cause of their termination. (Doc. No. 11 at 12.) Plaintiffs respond that *Gross* held only that the mixed-motive analysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), was inapplicable to ADEA cases. Plaintiffs argue that the traditional burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 972 (1973), applies here. (Doc. No. 13 at 10-11.) We agree.

In *Gross*, the Supreme Court observed that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context." *Gross*, 129 S. Ct. at 2349 n.2 (citations omitted). In *Smith v. City of Allentown*, 589 F.3d 684 (3d Cir. 2009), the Third Circuit Court of Appeals discussed the issue of whether *Gross* precluded the use

---

[4] Courts in this circuit apply the same analysis to both ADEA claims and PHRA claims. *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).

of the *McDonnell Douglas* analysis in ADEA cases and recognized that "*Gross* expressed significant doubt about any burden-shifting under the ADEA." *Id.* at 691. The court nevertheless concluded that while *Gross* stood for the proposition that it is improper to shift the burden of *persuasion* to the defendant in ADEA cases, the *McDonnell Douglas* framework only shifts the burden of *production* to the defendant. *Id.* As the court stated, "[t]hroughout this burden-shifting exercise, the burden of persuasion, 'including the burden of proving "but for" causation or causation in fact, remains on the employee.'" *Id.* (quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995)). Thus, in the Third Circuit the *McDonnell Douglas* burden-shifting framework continues to apply in ADEA cases. *Id.*

Since Plaintiffs offer no direct evidence of age discrimination, we apply the *McDonnell Douglas* burden-shifting analysis here. *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 337-38 (3d Cir. 2002) ("An ADEA plaintiff can meet [his] burden by (1) presenting direct evidence of discrimination . . . , or (2) presenting indirect evidence of discrimination that satisfies the familiar three-step framework of *McDonnell Douglas* . . . ."). Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this initial burden, the defendant can rebut this prima facie case by providing a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant meets its burden of production, the plaintiff must then demonstrate by a preponderance of the evidence that the defendant's proffered legitimate reason was a pretext for discrimination. *Id.* at 804.

### A.     Plaintiffs' Prima Facie Case

To establish a prima facie case of discrimination in ADEA cases, a plaintiff must show

that (i) the plaintiff was a member of the protected class, i.e., was 40 years of age or older; (ii) the plaintiff was discharged; (iii) the plaintiff was qualified for the job; and (iv) the plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (citations omitted). "[T]he prima facie case under the *McDonnell Douglas-Burdine* pretext framework is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Defendant contests only the second and fourth elements of the prima facie case. (Doc. No. 11 at 18-19.)

Regarding the second element, it is undisputed that Defendant terminated Plaintiffs' positions, after which Plaintiffs were no longer employed by Defendant. Clearly this is an adverse employment action which satisfies the second element for both Plaintiffs. *See Cange v. Phila. Parking Auth.*, No. 08-3480, 2009 WL 3540784, at *7 (E.D. Pa. Oct. 30, 2009) (finding that the plaintiff's termination was an adverse employment action). Regarding the fourth element, which requires that the terminated employee be replaced by a sufficiently younger employee, courts have not required that any particular age difference be shown. *Sempier*, 45 F.3d at 729 (citing *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 792 (3d Cir. 1985)). Rather, a plaintiff "may point to a sufficient age difference between himself and his replacement such that a fact-finder can reasonably conclude that the employment decision was made on the basis of age." *Id.* Courts have held that a five-year age difference is sufficient, *see Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir. 1981), but a one-year difference is not, *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1087 (3d Cir. 1992). Lawson's duties fell to employees who ranged from 6 to 24 years younger than Lawson. (*See* Doc. No. 11, Ex. Q at 1, 5, 8, 11.) This age difference

12

would appear to satisfy the fourth element. Lawson has therefore established a prima facie case of discrimination.

After Shipe's position was terminated, her duties were performed by members of the Haverford police department. (Gentile Dep. 53:3-12.) Plaintiffs' counsel has not adduced evidence regarding precisely which officers took on Shipe's duties, or how old they are. Defendant states in his Motion for Summary Judgment that Shipe's responsibilities fell primarily to two police officers—Sergeant Viola, age 59, and Sergeant Hagan, age 41—and Shipe's former secretary, Catherine Kelly, age 63. (Doc. No. 11 at 18-19.) Although Kelly is only three years younger than Shipe, we find that, given the disparity in age between Shipe and the other township employees who took on her duties, and considering the Third Circuit's admonition that establishing a prima facie case "is not intended to be onerous," *Sempier*, 45 F.3d at 728, Shipe appears to satisfy the fourth element. *See id.* at 729-30 (finding that the plaintiff had established a sufficient age difference between himself and his replacements where one replacement was four years younger and the other was over ten years younger; "[t]he combined differences in age . . . is clearly sufficient to satisfy the fourth prong of a prima facie case"); *see also Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("The framework set forth in *McDonnell Douglas*, which begins with proof of a prima facie case, was 'never intended to be rigid, mechanized, or ritualistic.'" (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978))). Shipe has therefore established a prima facie case of age discrimination.

B.  **Defendant's Reason for its Actions**

Defendant states that "budgetary and efficiency concerns" caused it to eliminate Plaintiffs' positions. (Doc. No. 11 at 19; *see also* Doc. No. 11, Ex. N at 2 (budget message

13

seeking to "eliminate additional expenses through ongoing cost containment, budgetary saving practices, and by adopting new purchasing policies and procedures").) Gentile's budget message demonstrates that even after eliminating Plaintiffs' positions, the township would need to raise taxes to avoid a budget shortfall. (Doc. No. 11, Ex. N at 1.) Gentile testified in his deposition that he felt the safety director position could be "easily eliminated," resulting in a "savings within the operating budget of the township." (Gentile Dep. 53:8-12.) The 2005 Econsult report also concluded that the safety director position could be eliminated and its duties handled by other township employees. (Doc. No. 11 Ex. F. at 9.) Similarly, Gentile testified that Lawson's position "could be easily done by other staff members within the Public Works department." (Gentile Dep. 54:14-17.) These are legitimate, nondiscriminatory reasons for terminating Plaintiffs' employment with Defendant.

    **C.    Whether Defendant's Proffered Legitimate Reason Was a Pretext for Discrimination**

To defeat summary judgment, Plaintiffs must offer evidence that Defendant's desire to eliminate costs and generate efficiencies in order to avoid a larger tax increase is a pretext for age discrimination. Plaintiffs may do so by (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). "Pretext is not demonstrated by showing simply that the employer was mistaken." *Sempier*, 45 F.3d at 731 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). Rather, Plaintiffs "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (citations and internal quotation marks omitted).

Plaintiffs argue that their positions were both long-standing positions whose duties were not eliminated, and that the savings from their termination were de minimus in the overall budget. (Doc. No. 13 at 11-12.) Plaintiffs also argue that Gentile had other cost-saving options that "would seem to make more sense," and that it was inefficient to give Plaintiffs' duties to higher-paid employees who were not as experienced. (*Id.* at 12-13.) This is precisely the kind of second-guessing that the Third Circuit has explicitly stated does not establish pretext in discrimination cases. "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765 (citations omitted). Plaintiffs' suggestion that Defendant could have achieved its goals in other ways does not establish pretext for discrimination.

Plaintiffs also argue that the ages of the four employees whose positions were affected by the 2008 budget permit the inference that age was a factor in Plaintiffs' dismissal. (Doc. No. 13 at 13.) Plaintiffs argue that the four positions that were affected by the 2008 budget—safety director, highway inspector, codes inspector, and fire marshal—were staffed by persons aged 66, 65, 78, and 67, respectively. Even assuming Plaintiffs' position, as we must, that the 2008 budget eliminated the 78-year-old James Gilhol's position rather than the 54-year-old Charlie Falance's position, as Defendant contends, this is insufficient to establish pretext. This reasoning

is an example of the logical fallacy of false cause,[5] which courts have rejected in the context of an ADEA action. In *Carter v. Westinghouse Electric Corp.*, 703 F. Supp. 393 (W.D. Pa. 1988), the three oldest members of the defendant's Corporate Quality Group were terminated. The plaintiff presented the court with statistical evidence showing the improbability of this occurring unless age had played a role in the plaintiff's termination. *Id.* at 398. The court recognized the fallacy, noting dryly that the plaintiff's argument was akin to arguing that "I drink coffee each morning, the sun comes up each morning, therefore, sunrise is due to my drinking coffee. . . . [T]he statistical correlation is at least as strong as that proffered by plaintiff." *Id.* The court found that the plaintiff's statistical evidence failed to prove pretext. *Id.* We likewise conclude that the mere fact that Gilhol, Marino, and both Plaintiffs were among the township's oldest employees does not constitute the kind of weakness, implausibility, or contradiction that would permit a reasonable factfinder to infer pretext. *See Fuentes*, 32 F.3d at 765 (citations and internal quotation marks omitted).

Plaintiffs also argue that the three dissenting commissioners "concluded that the decisions [to terminate Shipe and Lawson] were discriminatory after hearing the 'explanation'" that Gentile provided in the December 10, 2007, meeting. (Doc. No. 13 at 13.) The record does not support this statement. Although Commissioner McGarrity expressed his belief that Plaintiffs' termination was due to their age, this was his own speculation—not a conclusion that he reached after hearing Gentile's explanation of the 2008 budget, as Plaintiffs maintain. (*See* McGarrity Dep. 21:22-23 ("[I]t just seemed like, you know, they picked a lot of people who were older.").) Indeed, Commissioner McGarrity explicitly stated that he had heard no mention of age from

---

[5] *See* Ruggero J. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 199-203 (3d ed. 1997).

Gentile or any of the other commissioners during the December 10, 2007, meeting. (*Id.* at 42:7-44:14.) Although Commissioners Moran and McDonald voted against the 2008 budget and voiced their disapproval over terminating older employees, neither would speculate that Plaintiffs were terminated because of their age, and both stated that they did not recall hearing anything about Plaintiffs' age during the budget meeting. (Moran Dep. 15:24-16:6; 17:13-18; McDonald Dep. 16:9-18:4.) Plaintiffs' assertion that the dissenting commissioners believed that Plaintiffs' termination was the result of discrimination is not supported in the record.

We are satisfied that Plaintiffs have failed to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *See Fuentes*, 32 F.3d at 765 (citations and internal quotation marks omitted). The speculation of Plaintiffs and Commissioner McGarrity, without more, is insufficient to establish a triable issue of fact.

The township commissioners were faced with a budget shortfall and the necessity to raise taxes. They were looking for ways to cut expenses. The fact that their decision was less than compassionate and adversely impacted Lawson and Shipe among others does not establish that their reasons were a pretext for discrimination. Summary judgment for Defendant is therefore appropriate.

IV. **CONCLUSION**

For the foregoing reasons, the Township of Haverford's Motion for Summary Judgment will be granted.

An appropriate Order follows.

BY THE COURT:


/s/ *R. Barclay Surrick*
U.S. District Judge